UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Court File No. 15-cr-165 (JRT/LIB) (35)

    Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Lucas John Peterson,

    Defendant.

   This matter comes before the undersigned United States Magistrate Judge upon Defendant Lucas John Peterson's ("Defendant") Motion to Suppress Statements, [Docket No. 560]; Motion to Suppress Search and Seizure, [Docket No. 562]; Motion for Severance of Defendants, [Docket No. 564]; and Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 581]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on October 20, 2015, regarding the parties' pretrial motions.[1]

   At the motion hearing, the Court granted the parties' requests for the opportunity to provide supplemental briefing. The Court took Defendant's Motion to Suppress Statements, [Docket No. 560]; Motion to Suppress Search and Seizure, [Docket No. 562]; Motion for Severance of Defendants, [Docket No. 564]; and Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 581], under advisement on November 15, 2015.

---

[1]The Court addressed the parties' pretrial discovery motions by separate order, [Docket No. 977].

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 560], be **DENIED**; that Defendant's Motion to Suppress Search and Seizure, [Docket No. 562], be **DENIED**; that Defendant's Motion for Severance of Defendants, [Docket No. 564], be **DENIED**; and that Defendant's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 581], be **DENIED**.

## I.   BACKGROUND AND STATEMENT OF FACTS

### A.  Background

On May 20, 2015, Defendant was indicted with one charge of conspiracy to distribute heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. (Indictment [Docket No. 1]).

### B.  Facts[2]

#### 1.  Search Warrant

On April 14, 2015, Becker County Sheriff's Department Investigator Daniel Skoog ("Investigator Skoog") was on special assignment to the West Central Minnesota Drug and Violent Crimes Task Force as a Special Agent Investigator.  At some point prior to that date, he became part of an investigation regarding Defendant. Investigator Skoog became aware of ongoing narcotics investigations being conducted by the Drug Enforcement Agency ("DEA"), the Department of Alcohol, Tobacco, and Firearms ("ATF"), and other regional narcotics task forces, which had obtained authorization to intercept communications to and from a cellular phone. On April 13, 2014, a telephone call to that phone was intercepted, the contents of which came to Investigator Skoog's attention. Based on his knowledge of the contents of the telephone call and the existence of the other investigations, on April 14, 2014, Investigator Skoog drafted

---

[2] The Court's statement of facts is derived from the testimony of Becker County Sheriff's Department Investigator Daniel Skoog at the October 20, 2015, motions hearing, as well as, the exhibits introduced during the hearing.

an application for a warrant to search a residence located at 36644 Martin Drive Unit #65 ("the Martin Drive Residence"), in Waubun, Minnesota, which is located in the White Earth Indian Reservation. (Govt. Ex. 5).

Prior to drafting the search warrant application, an officer looked up the lease associated with the Martin Drive Residence and discovered that Cheyenne Fasthorse, the mother of Defendant's children, lived there and that her name was on the lease. At the time that Investigator Skoog drafted the application for the warrant, Defendant was prohibited from being at the residence as a result of previous domestic issues with Cheyenne Fasthorse.

In the affidavit submitted in support of the search warrant application, Investigator Skoog stated that the DEA, the ATF, and other agencies, including the Headwaters Safe Trails and Paul Bunyan Task Forces and the Minnesota Bureau of Criminal Apprehension, had begun an investigation of a drug trafficking organization led by Omar Beasley ("Beasley"), as part of which law enforcement had seized and purchased more than 1.5 kilograms of heroin, an ounce of methamphetamine, and hundreds of controlled prescriptions pills that were directly attributed to the organization. (Id.).  Investigator Skoog noted that law enforcement knew that Beasley was engaged in the trafficking of illegal narcotics and was a major source of illegal narcotics on the Red Lake and White Earth Indian reservations. (Id.). Investigator Skoog reported that law enforcement also knew that Beasley had more than twenty individuals working in different roles in his organization. (Id.).

Investigator Skoog indicated that law enforcement had learned of information on which it was believed that Defendant worked for Beasley distributing drugs on the White Earth Indian Reservation. (Id.).  Investigator Skoog stated that a confidential source, referred to as "CS2", had reported having travelled with Beasley in the summer of 2014 to White Earth, Minnesota, where

Beasley met with a male named "Luke" on two occasions; and that CS2 had seen Beasley give "Luke" ten grams of heroin on one of those occasions. (Id.). Investigator Skoog stated that law enforcement believed "Luke" to be Defendant. (Id.). Investigator Skoog noted that CS2 had provided information regarding Beasley, with whom she had previously had a sexual relationship, in exchange for future consideration in a pending drug case. (Id. at n. 1). Investigator Skoog also stated that CS2 had been identified by other members of Beasley's drug trafficking operation as having received quantities of up to 100 grams of heroin from Beasley. (Id. at n.1). Investigator Skoog further indicated that CS2 had provided names and addresses that had been verified by independent investigation. (Id. at n. 1).

Investigator Skoog stated that, on January 29, 2015, a different confidential informant, identified as "CS6," had made a controlled purchase of heroin from Defendant at the Martin Drive Residence. (Id. at 3-4) The controlled purchase was monitored and audio recorded by the police. (Id.).  Investigator Skoog also noted that during the controlled purchase CS6 had given Defendant an additional $300 to give to Beasley as a partial payment for an outstanding debt. (Id. at 4). Investigator Skoog reported that CS6 later made a recorded phone call to Beasley following the controlled purchase, during which CS6 asked Beasley if Defendant had given him the $300, to which Beasley stated that he had. (Id. at 4). Investigator Skoog noted that, during that same call, Beasley told CS6, "[d]rop it over there and you can go pick it up," and when asked how much he would drop off, Beasley had said "Probably about fifty to one hundred." (Id.). Investigator Skoog stated that law enforcement believed the phone call to mean that Beasley would leave 50 to 100 grams of heroin with Defendant for CS6 to pick up. (Id.).

Investigator Skoog further reported that CS6 purchased an additional 3.62 grams of heroin from Defendant at the Martin Drive Residence on April 9, 2015. (Id. at 4). Investigator

4

Skoog also noted in the affidavit submitted in support of the search warrant that CS6 was receiving financial compensation for living expenses as well as consideration on pending narcotics charges. (Id. at n. 2). Investigator Skoog also reported that CS6 had provided information, including, names, addresses, and telephone numbers that had been verified by independent investigation. (Id. at 4-5 n. 2). Investigator Skoog further noted that law enforcement had then-recently received information that CS6 may have been independently engaging in unauthorized drug sales during the period of time he had been cooperating with law enforcement, and law enforcement was at that time investigating the allegation. (Id. at 5 n. 2).

Investigator Skoog's affidavit in support of the search warrant also reported that the ongoing investigations had twice obtained authorization to intercept phone calls from cellular phones being used by Beasley. (Id. at 4).  Investigator Skoog stated that, at 9:32 p.m. on April 13, 2015, Beasley's phone received a call from the phone of Samantha Fasthorse, whom law enforcement knew to be a girlfriend of Durial John Jackson ("Jackson"), that had been made by a person named John, whom law enforcement believed to be Jackson. (Id. at 4). According to Investigator Skoog, John told Beasley that he "just bought us another toy." (Id.).  Beasley responded, "What kind?" (Id.). John stated, "A nine... with the muzzle break on the end of it." (Id.).  Beasley asked John whether Luke had been trying to get it, to which John replied, "He just looked at it and his eyes lit right up, he thought it was a pellet gun." (Id.). John asked Beasley if he wanted to speak to Luke, to which Omar Beasley stated that he did. (Id.). Luke then began speaking to Beasley on the call. (Id.).  As described by Investigator Skoog, Beasley told Luke, "They gave it to me.  It went up just a little bit... but it's fire…. Remember I told you 75?... It's just 85… it went up … ten bucks on me.  … And guess what? … It's the same shit you got rich off… that shit I had in the summertime…." (Id.).  Beasley then told Luke that he was going to

split it with him, to which Luke responded, "Alright." (Id.). Luke then told Beasley, "I got that straight kill uncut in the fucking safe still, like sixty of it.  I gotta put that thing on it… otherwise I'll kill'em all. I won't have no clientele." (Id.). Beasley then asked Luke if he was talking about that "grey show," to which Luke responded in affirmative. (Id. at 4-5).  Beasley then asked Luke, "You gonna let me get that thing that John got or are you going to try to get it?" (Id. at 5).  Luke laughed in response and said, "You can."

Investigator Skoog stated that law enforcement believed that Defendant and Beasley had been discussing a gun that Jackson had obtained, and that Beasley had then told Defendant that he had obtained a large amount of high quality heroin at $85 dollars per gram. (Id. at 5). Investigator Skoog stated that he knows that "fire" is a common term used by drug dealers to describe the quality of drugs they sell. (Id.).  Investigator Skoog also stated that law enforcement believed that Defendant told Beasley that he still had sixty grams of the same high-quality heroin in his safe and that, because of the strength of the heroin, the needed to "cut" the heroin as it would otherwise cause his clients to overdose. (Id.).

Investigator Skoog reported that, at approximately 7:00 a.m. on April 14, 2015, a Becker County Deputy Sheriff had stopped Samantha Fasthorse and Durial John Jackson as they were leaving a known residence of Defendant in a 1990 Brown Mercury Marquis with a damaged window bearing a White Earth license plate. (Id. at 5). Investigator Skoog stated that the deputy had told Samantha Fasthorse and Jackson that the Marquis was unsafe to drive and had then observed as the two returned to the Defendant's residence. (Id.).

Investigator Skoog also described how he had observed a red Chevrolet Tahoe with Minnesota license plates ("the Tahoe"), a blue Cadillac with Minnesota license plates (the

Cadillac"), and the Mercury Marquis parked at the Martin Drive Residence. Investigator Skoog had also seen Defendant driving the Tahoe and riding as a passenger in the Marquis. (Id.).

Investigator Skoog noted that the Becker County Sheriff's Office Record management system listed Defendant's address as matching the Martin Drive Residence. (Id.). Investigator Skoog further stated that Defendant has convictions for burglary and assault, for which he is prohibited from possession or receiving a firearm. (Id.).

Investigator Skoog related that, in his training and experience, drug dealers often conceal drugs, money, and valuables in hidden locations, and that such items are commonly found on the persons and in the vehicles and residences of those selling controlled substances. (Id.).

On April 14, 2015, the Honorable Joseph A. Evans, District Judge of the Seventh Judicial District of the State of Minnesota, based on the foregoing found that probable cause existed to search the Martin Drive Residence, the attached garage, the Tahoe, the Marquis, the Cadillac, and the persons of Defendant and Jackson. (Govt. Ex. 5 at 7-8). The search warrant authorized the executing officers to search those places, vehicles, and persons, for controlled substances, items associated with distribution of heroin, written materials associated with documenting the sale and/or possession of heroin, safe deposit keys, records and other documents showing off premises storage, bank records and other items indicating profit from the sale of controlled substances, firearms, and monies found in proximity to controlled substances. (Id. at 7).

Later that day, Investigator Skoog and fifteen other officers executed the warrant to search the Martin Drive Residence. Defendant was not at the residence and the officers found no personal property of Defendant when executing the warrant.  Although the officers tried other avenues of investigation in addition to the search warrant, the officers were not able to locate Defendant on April 14, 2015.

2.   The Indictment

On May 20, 2015, Defendant was indicted with the charges against him. (Indictment, [Docket No. 1]). In the Indictment, the Government alleges that between April 2014, and April 2015, "the defendants, conspiring with and aiding and abetting one another and other persons known and unknown to the grand jury participated in various roles and ways to procure, transport, and distribute controlled substances including heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone to the communities in and surrounding the Red Lake Indian Reservation, the White Earth Indian Reservation, and Native American communities elsewhere." (Id. at ¶ 1). The controlled substances were procured and transported from Detroit, Michigan; Chicago, Illinois; and Minneapolis, Minnesota, among other locations. (Id. at ¶ 2). The Indictment charges a total of forty-one (41) defendants as violating Title 21, United States Code, Section 841(a)(1). (Id. at ¶ 12, Count I).

Regarding Defendant, the Indictment alleges that he, along with other co-defendants, "did, among other things, facilitate, supervise, manage, transport, receive and transfer funds, and distribute controlled substances during the course of the conspiracy." (Id. at ¶ 11). The Indictment also alleges that Defendant's conduct as a member of the "narcotics conspiracy charged in Count 1, which includes the reasonably foreseeable conduct of other members of the narcotics conspiracy charged in Count 1, involved 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(A), and quantities of mixtures and substances containing detectable amounts of heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone, in violation of Title 21, United States Code, Section 841(b)(1)(C)." (Indictment, [Docket No. 1], at ¶ 16).

3.  May 27, 2015, Interview

Investigator Skoog later became aware of an arrest warrant that had been issued for Defendant as a result of the Indictment.  On May 27, 2015, Investigator Skoog received information that Defendant was at a home on County Highway 21 in the village of White Earth, Minnesota, that was located approximately two blocks northwest of the Martin Drive Residence. Investigator Skoog and six other officers went to the home to attempt to execute the arrest warrant there.  The officers located Defendant at the home when three of the officers knocked on the door of the home and Defendant came to the front door to answer the knock. The officers arrested Defendant at that time.

Later that same day, Investigator Skoog, ATF Special Agent Russ Trawrick ("SA Trawrick"), and Special Agent Gary Kuhn interviewed Defendant at the Becker County Sheriff's Office, where he was being held in custody.

Defendant was brought into the interview room in handcuffs where the three officers were waiting. When Defendant was brought into the room, SA Trawrick had a stack of files in front of him, on which rested a face up picture of Omar Beasley.

The officers began the interview by introducing themselves.  (Govt. Ex. 4 at 0:00-0:20). SA Trawrick then told Defendant that the officers were going to read him the Miranda warnings. (Id. at 0:20-0:30). However, before the officers read Defendant the Miranda warnings, SA Trawrick told Defendant that it was his choice whether to speak to the officers; that the officers would be willing to share the information that they had already obtained during their investigation; and that the officers already had a lot of specific information. (Id. at 0:30-0:52). SA Trawrick then stated again that it was Defendant's choice how to proceed; that Defendant

had been arrested on federal charges; that he was going to read Defendant his rights; and that Defendant could stop the questioning at any time and go back to his cell. (Id. at 0:50-1:15).

SA Trawrick then read Defendant the <u>Miranda</u> warnings, after which he asked Defendant whether he understood the rights that had been read to him, to which Defendant responded by nodding his head up and down and making a "mm-hmm" sound. (Id. at 1:15-1:38). SA Trawrick then began to ask Defendant questions. (Id. at 1:40). Approximately two minutes into the interview, SA Trawrick tapped the picture of Beasley and indicated that Defendant knew Beasley and that the investigation concerned Beasley and others.  (Id. at 2:10-2:35).  SA Trawrick then told Defendant that the officers had spoken to Beasley and that Beasley had corroborated everything that the officers already knew. (Id. at 2:50). SA Trawrick then told Defendant that if he cooperated with them and provided information, the officers would tell the prosecutor that he had cooperated. (Id. at 2:55-3:50). SA Trawrick then reiterated that Defendant had the choice not to cooperate. (Id. at 3:55). SA Trawrick then began asking Defendant direct questions about his dealings with Beasley and narcotics. (Id. at 4:00). Defendant answered SA Trawrick's questions, often providing more information than requested by SA Trawrick. (See, gen., Id. at 4:00-46:50).

At two more points during the interview, SA Trawrick stated to Defendant that he did not have to talk to the officers. (Id. at 15:25; 42:50). Approximately forty-seven minutes into the interview, Defendant told the officers that he had nothing more to say. (Id. at 47:00). SA Trawrick asked whether Defendant wanted to stop talking about the topic of the particular question that had just been posed to him or whether Defendant wanted to terminate the interview. (Id. at 47:05-47:25). Defendant repeated that he had nothing more to say and the officers terminated the interview. (Id. at 47:25-47:55).  The officers did not ask Defendant any questions after the point at which Defendant indicated he wanted to end the interview.

To Investigator Skoog, Defendant did not appear to be under the influence of any intoxicants and he appeared to be able to understand the questions being asked of him during the interview.

At the October 20, 2015, motions hearing, Investigator Skoog provided additional testimony regarding CS2 and CS6. He testified that neither CS2 nor CS6 had previously worked as confidential informants and thus had not previously provided the police with reliable information; that CS2 was a woman who had never met Defendant and was unable to identify him; and that Investigator Skoog had not spoken directly with CS2 himself.

Investigator Skoog also testified that CS6 had begun working for the task force when he was arrested on a narcotics charge. At some point, while CS6 was working as a confidential informant, CS6 began independently selling drugs. CS6's sale of drugs was not part of his duties as a confidential informant, and the task force was initially unaware that CS6 had been selling drugs. The task force did ultimately receive allegations that CS6 was selling drugs and conducted an investigation into CS6's activities. The task force eventually verified that CS6 had been independently selling illegal narcotics while working as a criminal informant, and it stopped using CS6 as an informant.

## II.   DEFENDANT'S MOTION TO SUPPRES STATEMENTS, [Docket No. 560]

Defendant moves the Court to suppress the statements that he made while being interviewed at the Becker County Sheriff's Department on May 27, 2015.

### A.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney."  United

States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

A defendant may waive the Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

**B. Analysis**

Defendant contends that his statements were not the product of a knowing, intelligent, and voluntary waiver of his Miranda rights, arguing that the officers failed to obtain his express waiver of those rights.

Whether statements made during a custodial interrogation must be suppressed is determined by inquiring into the totality of the circumstances "to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." Fare v. Michael C., 442 U.S. 707, 724-25 (1979) (citing Miranda, 384 U.S. at 475–477). The Government is not required to demonstrate that a defendant's waiver of the Miranda rights was made expressly. Berghuis v. Thompkins, 560 U.S. 370, 384 (2010). Rather, the Government may show that a defendant implicitly waived the Miranda rights by demonstrating the Defendant's silence, coupled with a showing that the defendant understood his rights and a course of conduct indicating waiver. Id.

The record before the Court indicates that, after reading Defendant the Miranda warnings, SA Trawrick asked Defendant whether he understood those rights. Defendant responded to that question by nodding his head affirmatively in an up and down manner, and making a "mm-

hmm" sound.  Defendant then responded to SA Trawrick's questions for another forty minutes, often even providing the officers with information beyond that which they were seeking. Eventually, after being reminded at least twice that he need not speak with the officers, Defendant chose to stop answering the officer's questions and the interview was immediately terminated.

Numerous courts have concluded that a defendant's affirmative nod is a valid indication that a defendant understood the Miranda rights. See, e.g, Jenkins v. Leonardo, 991 F.2d 1033, 1038 (2d Cir. 1993) (finding that the defendant validly waived his right to counsel when he nodded that he understood his rights); United States v. Graves, 1997 U.S. App. LEXIS 3310, 4-7 (4th Cir.1997) (finding that by responding with affirmative nods and 'uh-huhs' to questions about whether the defendant understood his rights constituted a valid waiver). The fact that Defendant eventually terminated the interview by choosing to stop responding to questions similarly indicates that Defendant understood that he did not have to respond to the officers' questions.  In addition, Defendant displayed a course of conduct indicating that he intended to waive the Miranda rights by answering the officers questions, often even providing them with more information than they were seeking.

Further, the record presently before the Court indicates that the officers at no time attempted to inappropriately coerce Defendant into answering their questions, a "necessary predicate" to finding that a Miranda waiver or subsequent statement has not been voluntarily given. See Colorado v. Connelly, 479 U.S. 157, 167 (1986).

Upon considering the totality of the circumstances, the Court concludes that Defendant, after being advised of his Miranda rights, did knowingly, voluntarily, and intelligently waive those rights and voluntarily answered the officers' questions throughout the interview.

Accordingly, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, [Docket No. 560].

## III.  DEFENDANT'S MOTION TO SUPPRESS SEARCH AND SEIZURE, [Docket No. 562]

As initially drafted Defendant's motion asked the Court for an Order suppressing all evidence from searches or seizures associated with the execution of the April 14, 2015, search warrant at the Martin Drive Residence, and with Defendant's arrest on May 27, 2015.  (Def.'s Motion to Suppress Search and Seizure, [Docket No. 562]).  Defendant, however, does not offer any argument either in his original motion or his supplemental memorandum in support of his motion that the searches or seizures associated with his arrest on May 27, 2015, were in any way unlawful. (See, gen., Id.; Def.'s Memorandum of Law in Support of Motions, [Docket No. 937]). Accordingly, the Court deems Defendant to have abandoned any argument that the searches and seizures associated with his May 27, 2015, arrest were unlawful. See United States v. Edwards, 563 F. Supp. 2d 977, 994 (D. Minn. 2008) ("At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed."), aff'd sub nom. United States v. Bowie, 618 F.3d 802 (8th Cir. 2010).  Accordingly, the Court addresses the only argument articulated by Defendant in support of the present motion, that the warrant authorizing the search of the Martin Drive Residence was not supported by probable cause.

### A.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets

forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005); edits in Wiley). In addition, the issuing court's "'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the issuing court] had a 'substantial

basis for . . . [concluding]' that probable cause existed." Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

**B. Analysis**

Defendant contends that the warrant was not supported by probable cause, arguing that the affidavit in support of the search warrant relied substantially on CS2 and CS6, whom Defendant argues could not be considered reliable.

Investigator Skoog drafted the application for the search warrant and the affidavit in support of the application. (Gov't.'s Ex. 5).   In the affidavit in support of the application, Investigator Skoog refers to the ongoing investigation of Omar Beasley by various government agencies and a trafficking organization headed by Beasley that provided significant amounts of illegal narcotics to the Red Lake and White Earth Indian reservations. Investigator Skoog also noted that the investigation had seized or purchased significant amounts of illegal narcotics that were directly linked to Beasley's organization. Investigator Skoog's belief that Defendant worked for Beasley can be linked to several items referred to in the affidavit: a statement by CS2, that, in 2014, Beasley had met with and provided to a "Luke" in White Earth, Minnesota, ten grams of heroin; that "Luke" is believed to be Defendant; an audio recorded and police monitored controlled purchase in January of 2015 at the Martin Drive Residence of .5 grams of heroin by CS6 from Defendant; also while CS6 was under the direction and control of Investigator Skoog, CS6 provided Defendant with $300 to give to Beasley as a purported payment on an outstanding debt after which a recorded phone call from CS6 to Beasley was made in which CS6 asked Beasley if he had received the $300 that CS6 had given to Defendant to give to Beasley, and Beasley responded that he had received the money; CS6's second controlled purchase of a significant amount of heroin from Defendant at the Martin Drive

Residence on April 9, 2015; an intercepted phone call during the evening of April 13, 2015, which was made to Beasley's phone from the phone of Samantha Fasthorse by Durial John Jackson, in which Beasley speaks directly to "Luke" using terms that Investigator Skoog knows, based on his experience and training, are used by drug dealers to refer to the quality of drugs and "Luke" speaks to Beasley using terms that Investigator Skoog believes indicated that "Luke" was possession of a sixty grams of high quality heroin in a safe; and the fact that Samantha Fasthorse and Durial John Jackson were seen the next morning coming from and returning to the Martin Drive Residence in a vehicle in which Investigator Skoog had previously seen Defendant riding as a passenger.

Even assuming that CS2 and CS6 are not alone reliable informants, the additional independent information in Investigator Skoog's affidavit was sufficient to provide Judge Evans with a substantial basis to conclude that probable cause existed to believe that evidence of a crime could exist at the Martin Drive Residence.

CS2 only provided information that Beasley had on a single occasion provided a "Luke" in White Earth a significant amount of heroin in the summer of 2014.  It is believed that "Luke" also refers to Defendant. The information in Investigator Skoog's affidavit, however, that provides the more substantial basis to believe that Defendant was working for Beasley as part of his drug trafficking organization comes independently from the January 2015 controlled purchase through CS6, and the subsequent phone call from CS6 to Beasley that police recorded, in which CS6 inquires of Beasley whether Defendant gave Beasley money that CS6 had provided to Defendant during that controlled purchase. Defendant identifies no pertinent information regarding the controlled purchase or the phone call that could have come only from CS6. Rather, the details of the controlled purchase also come from the audio recording and active

monitoring by Investigator Skoog.  Similarly, the details of the subsequent phone call to Beasley do not come solely from CS6 but from the police recording of the phone call. Accordingly, CS6's reliability in providing information is irrelevant to the independent information in the affidavit that links Defendant to the Beasley organization.

Accordingly, even assuming that CS2 and CS6 are not alone reliable informants, the independent, investigatory information which followed up on the information provided by CS2 and CS6 set forth in in Investigator Skoog's affidavit in support of the search warrant application still provided a substantial basis on which Judge Evans could conclude that probable cause existed that Defendant worked for the Beasley drug trafficking organization.

Additionally, the other independent information in Investigator Skoog's affidavit linked the presence of possible contraband to the Martin Drive Residence. During the evening April 13, 2015, recorded phone call, "Luke" spoke to Beasley using terms that Investigator Skoog believed indicated that he was in possession of sixty grams of high quality heroin that he kept in a safe. The phone call to Beasley's phone, on which that recorded conversation was held, originated from Durial John Jackson using the phone of Samantha Fasthorse. Samantha Fasthorse and Durial John Jackson had been seen coming from Defendant's residence at 7:00 a.m. the next morning in a car in which Investigator Skoog had previously seen Defendant riding as a passenger.  Samantha Fasthorse and Durial John Jackson were then observed returning to the Defendant's Martin Drive Residence when a deputy informed her that the car was unsafe due to a broken window.

Accordingly, the affidavit provided Judge Evans with a substantial basis to believe that Samantha Fasthorse had been in the company of Defendant, who was referred to by Beasley as "Luke," very recently, and that Defendant was at that time still in possession of a significant

amount of heroin.  The affidavit also indicates that four days before the execution of the warrant, on April 9, 2015, CS6 made a controlled purchase of a quantity of heroin from Defendant at the Martin Drive Residence. Together with Investigator Skoog's statement that it is his experience that drug dealers will often keep illegal narcotics hidden in their homes, "Luke's" statement to Beasley that he had sixty grams of heroin in a safe, and the purchase from the Martin Drive Residence, Judge Evans had a substantial basis to believe probable cause existed that the heroin existed in the Martin Drive Residence.

Because the whole of the information provided by Investigator Skoog's affidavit in support of the application for the warrant to search the Martin Drive Residence provided Judge Evans with a substantial basis based on the totality of the circumstances to conclude that probable cause existed to believe that heroin could be found at the Martin Drive Residence, the Court recommends **DENYING** Defendant's Motion to Suppress Search and Seizure, [Docket No. 562].

## IV.   DEFENDANT'S MOTION FOR SEVERANCE OF DEFENDANTS, [Docket No. 564]

Defendant moves the Court for an order, pursuant to Federal Rule of Criminal Procedure 14, severing his case from those of all of the other defendants in the present case. (Def.'s Motion for Severance, [Docket No. 564]).

### A.  Standard of Review

An indictment may charge two or more defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "For proper joinder under this provision, it is not necessary that every defendant have participated in or be charged with each offense." United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996) (internal quotation and

citation omitted). "[R]arely, if ever, will it be improper for co-conspirators to be tried together." Id. (citing United States v. Jackson, 64 F.3d 1213, 1217 (8th Cir. 1995)).

The Federal Rules of Criminal Procedure also provide that if joinder creates prejudice to either the Government or a defendant, the Court may sever a trial "or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). However, "[i]f, under Rule 8, joinder is proper, then the defendant seeking severance has a 'heavy burden' in demonstrating that a joint trial will impermissibly infringe his right to a fair trial." United States v. Hopkins, No. 11–230 (DWF/SER), 2011 U.S. Dist. LEXIS 127071, at *25–26 (D. Minn. Oct. 5, 2011) (citing Warfield, 97 F.3d at 1019). "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537 (1993); see also United States v. Clay, 579 F.3d 919, 927 (8th Cir. 2009). "Joint trials play a vital role in the criminal justice system," because they achieve certain efficiencies, and because they "avoid[ ] the scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 209–10 (1987). "Only in an unusual case will the prejudice resulting from a joint trial be substantial enough to outweigh the general efficiency of joinder." Clay, 579 F.3d at 927 (citing United States v. Al–Esawi, 560 F.3d 888, 891 (8th Cir. 2009)). "The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions." United States v. Mickelson, 378 F.3d 810, 818 (8th Cir. 2004).

**B. Analysis**

Defendant offers boilerplate arguments in support of his motion, asserting in a conclusory fashion that unidentified evidence will be introduced that would be inadmissible as to defendant; that a limiting instruction will not suffice to ensure that the jury will not be confused by such unidentified evidence; that it may be impossible for Defendant to confront evidence regarding

the statements of other co-defendants; and that the Government's case is based on large part on testimony from informants and, he assumes, post-conspiracy statements from co-defendants. (See Def.'s Motion for Severance, [Docket No. 564], 1-2). Defendant articulates no specific facts demonstrating either (1) that joinder of the defendants was improper under Rule 8(b), or (2) that continued joinder will create prejudice sufficient to warrant severance pursuant to Rule 14.

Defendant's boilerplate arguments as submitted on the present record do not suffice to carry his heavy burden to demonstrate that severance is warranted. The Court could summarily recommend denying Defendant's motion on this basis alone.  However, in an abundance of caution, the Court also notes that the factual allegations in the Indictment indicate that joinder was indeed proper under Rule 8(b) and that severance pursuant to Rule 14 is not warranted on the present record.

The factual allegations in the Indictment indicate that the Defendants participated in the same series of acts or transactions constituting the charged offenses. See Fed. R. Civ. P. 8(b). Specifically, the factual allegations set forth in the Indictment indicate that Defendant, along with other co-defendants and alleged co-conspirators, "did, among other things, facilitate, supervise, manage, transport, receive and transfer funds, and distribute controlled substances during the course of the conspiracy." (Indictment, [Docket No. 1], at ¶ 11). The factual allegations set forth in the Indictment also indicate that the defendants acting together conspired with others to possess, with intent to distribute, controlled substances including heroin, methamphetamine, oxycodone, hydromorphone, hydrocodone, and methadone. (Indictment, [Docket No. 1]). Accordingly, under Rule 8(b), joinder of the Defendants was proper as "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Warfield, 97 F.3d at 1019 (citing Fed. R. Crim.

P. 8). See also, Id. (noting that it is not necessary for the purpose of joinder that every defendant have been alleged to have participated in or be charged with every offense).

Because joinder of the Defendants was proper under Rule 8(b), Defendant necessarily bears the heavy burden of demonstrating that a joint trial will impermissibly infringe on his right to a fair trial. Nothing in the record presently before the Court, however, indicates that Defendant stands to incur any specific prejudice that is attributable to the joinder of the Defendants that would be sufficient to warrant severing Defendant's case. Defendant's boilerplate arguments do not identify any specific prejudice that he would incur as a result of the joinder of the Defendants and, as a result, are similarly insufficient carry his burden to show that severance is warranted here.

Defendant's singular citation to Bruton v. United States, 391 U.S. 123 (1968), is also insufficient to show that he would incur any specific prejudice attributable to joinder of the Defendants sufficient to warrant severance.   Defendant only generally asserts that evidence admitted against other co-defendants will prejudice him, and speculates that such prejudice can only be cured by severance pursuant to Bruton. Defendant has, again, offered no specific facts or specific arguments to support his mere conclusory assertion.

In Bruton, the petitioner and a co-defendant had been convicted of armed robbery in a joint trial after a postal inspector testified that Bruton's codefendant had confessed and had "expressly implicat[ed]" the petitioner. Bruton, 391 U.S. at 124 n. 1. The trial court instructed the jury that the co-defendant's confession "if used, can only be used against the [co-defendant]. It is hearsay insofar as the [petitioner] is concerned, and you are not to consider it in any respect to the [petitioner], because insofar as he is concerned it is hearsay." Id. at 125 n. 2. The Supreme Court, however, concluded that:

> [T]he introduction of [the co-defendant's] confession posed a substantial threat to the petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard [the co-defendant's] inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

Id. at 137. For that reason, the Supreme Court reversed the petitioner's conviction in Bruton. Id. at 126, 137.

However, even the Bruton court suggested that redacting a co-conspirator's testimony may be sufficient to cure any prejudice caused by the introduction of a co-defendant's incrimination statement, and acknowledged that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions." Id. at 134 n. 10, 135. In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court further distinguished between co-defendant statements that are "facially incriminating," and statements which merely are "incriminating by connection." Id. at 209. When a co-defendant's statement is facially incriminating of the defendant, redaction or even severance may be required because it is more difficult for jurors to set aside such evidence. Id. at 208. However, the Court rejected as both impractical and unnecessary the suggestion that the rule in Bruton extend to confessions that are incriminating by connection. Id. at 208–09.

As noted above, Defendant has not supported his motion by identifying any specific incriminating evidence, much less any specific co-defendant statements, that he believes would prejudice him if introduced at trial. Moreover, Defendant has not articulated any specific reason why the jury would be unable to compartmentalize any redacted statements or evidence upon being provided a proper instruction by the trial judge to do so. (See, gen., Def.'s Motion for Severance, [Docket No. 564]).

As articulated above, there is a strong preference in the federal system for joint trials. In light of that preference, and at this early juncture, where Defendant can only invite the court to speculate as to what evidence the Government might actually seek to introduce at a joint trial, severance is not appropriate. "Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances." United State v. Billups, No. 06-cr-129 (PJS/AJB), F. Supp. 2d 697, 706 (D. Minn. 2006).

For all the reasons articulated above, the Court recommends **DENYING** Defendant's Motion for Severance of Defendants, [Docket No. 564], without prejudice.

## V.   DEFENDANT'S MOTION TO SUPPRESS WIRE INTERCEPTIONS, ELECTRONIC SURVEILLANCE, AND OTHER EVIDENCE, [Docket No. 581]

Defendant moves the Court for an order suppressing any evidence obtained through wire interceptions, electronic surveillance, cellular phone tracking devices, global positioning devices, thermal imaging devices, transponders, public or private cameras, or any other method. (Def.'s Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 581]).

Defendant asserts no specific facts as to how or in what manner any evidence obtained by electronic surveillance was illegally obtained. (See Id.). Rather, Defendant's motion consists of a mere boilerplate, generic assertion that the Court should suppress all evidence gathered by electronic surveillance. (Id.). The Government also offers no specific facts as to how such electronic surveillance evidence was obtained. (See Gov. Resp. to Def.'s Mot. [Docket No. 783]) As such, the Court would be required to engage in base speculation to find that any evidence was obtained illegally by electronic surveillance.

"In motions to suppress evidence, a moving party must specify the statement or evidence which is sought to be suppressed, and articulate with clarity the factual and legal basis upon

which each is sought to be suppressed." <u>United States v. Quiroz</u>, 57 F. Supp. 2d 805, 822 (D.

Minn. 1999), <u>aff'd sub nom</u> <u>United States v. Vasquez</u>, 213 F.3d 425 (8th Cir. 2000). Where a

defendant "alleges only the barest allegation of taint, . . . [s]uch allegations are not sufficient to

require a[n evidentiary] hearing." <u>United States v. Losing</u>, 539 F.2d 1174, 1179 (8th Cir. 1976).

In addition, in light of Defendant's failure to advise the Court of any specific factual or legal

grounds whatsoever that would support his motion to suppress evidence, the Court may

recommend denying his Motion "on that basis alone." <u>United States v. Jones</u>, Crim. No. 09-

260(1) (DWF/RLE), 2009 WL 4723341, at *4 (D. Minn. Oct. 30, 2009) (Erickson, C.M.J.)

(citing <u>United States v. Mims</u>, 812 F.2d 1068, 1074 (8th Cir. 1987); and <u>Quiroz</u>, 57 F. Supp. 2d

at 822–23 ("boilerplate motion" to suppress statements denied due to failure to satisfy specificity

requirement)).

Because Defendant has provided no specific factual or legal grounds whatsoever as to

why this Court should suppress evidence obtained by electronic surveillance, the Court

recommends **DENYING** Defendant's Motion to Suppress Wire Interceptions, Electronic

Surveillance, and Other Evidence, [Docket No. 581].

## VI.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED**:

1.  That Defendant's Motion to Suppress Statements, [Docket No. 560], be **DENIED**, as set

    forth above;

2.  That Defendant's Motion to Suppress Search and Seizure, [Docket No. 562], be

    **DENIED,** as set forth above;

3.  That Defendant's Motion for Severance of Defendants, [Docket No. 564], be **DENIED**, as set forth above;  and,

4.  That Defendant's Motion to Suppress Wire Interceptions, Electronic Surveillance, and Other Evidence, [Docket No. 581]. be **DENIED**, as set forth above.


Dated: December 2, 2015.                           s/Leo I. Brisbois _____
                                                   Leo I. Brisbois
                                                   U.S. MAGISTRATE JUDGE


# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.